IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

JERRY WAYNE DAY,

      Plaintiff,

v.                                  No. 13-1089

FINISHING BRANDS HOLDINGS, INC.,

      Defendant.

_____

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
_____

*Introduction*

Before the Court is Defendant, Finishing Brands Holdings, Inc.'s ("FB"), motion for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Docket Entry

("D.E.") 71.)  Plaintiff, Jerry Wayne Day ("Day"), filed a response to which FB replied.  (D.E.

75, 89.)  Plaintiff, with the Court's permission, submitted a sur-reply. (D.E. 99.)  For the reasons

discussed below, Defendant's motion is GRANTED IN PART and DENIED IN PART.

*Evidentiary Matters*

I.      **Plaintiff's Objections to Defendant's Statement of Undisputed Material Fact**

Plaintiff has lodged evidentiary objections to Defendant's Statement of Undisputed

Material Facts ("SUMF"), contending that many of the paragraphs violate the district's local rule

on conciseness, and that two statements are inadmissible hearsay.  (*See* Plaintiff's Responses to

Statement of Undisputed Material Facts in Support of Finishing Brands Holdings, Inc.'s Motion

for Summary Judgment" ("RSUMF") ¶¶ 3–7, 10, 12–15, 17–19, 21, 23–25, 27–30, 33–38, 40, 43–46, 50–52, 56–57, 63, 65, 71, 74, 78–79, D.E. 75-1.)

A.      Conciseness

In this district, the party moving for summary judgment, "[i]n order to assist the Court in ascertaining whether there are any material facts in dispute," is required to provide "a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial."   LR 56.1(a), Local Rules of the United States District Court for the Western District of Tennessee ("Local Rules").   Any objections to evidentiary materials offered in support of, or in opposition to, a summary judgment motion must be included in the response or reply and identify the Rule of Evidence or other authority that establishes that evidence's inadmissibility.  *See* Local Rule 56.1(e).

The local rules, and opinions from this district, do not define "concise statement." However, in denying a plaintiff's motion to strike a portion of the defendant's statement of undisputed material facts on conciseness grounds, the United States District Court for the Middle District of Tennessee held that the defendant did not violate that district's similarly-worded local rule because the employment dispute at issue involved several incidents occurring over a period of time.  *See Thompson v. Davidson Transit Org.*, 740 F. Supp. 2d 938, 938–39 (M.D. Tenn. 2010).   Similarly, this case involves allegations of employment discrimination covering an extended period of time.  Defendant's SUMF is not unnecessarily lengthy—it is seventeen pages long, and consists of seventy-nine numbered paragraphs that address the relevant facts underlying this lawsuit.  Plaintiff's objections are OVERRULED.

### B.        Hearsay

Day objects to SUMF ¶¶ 52 and 57 on hearsay grounds, but has failed to "identify the Rule of Evidence or other authority that establishes [the] inadmissibility of the proffered evidence" as required by Local Rule 56.1(e).    Plaintiff's objections are OVERRULED.   *See Hillman v. Shelby Cnty.*, No. 05-2052-STA-tmp, 2012 WL 681778, at *1 (W.D. Tenn. Feb. 29, 2012) (overruling a plaintiff's objections because she "did not reference a specific Rule of Evidence" or "cite to other authority establishing the inadmissibility of the evidence offered" by the defendant and instead offered "[b]road, sweeping, generalized objections" that were "insufficient to satisfy the requirements of the Local Rules[.]").   Regardless, the statements are not inadmissible hearsay because they are only being offered to show their effect on the listeners, and not for their truth.   *Rhoades v. Standard Parking Corp.*, 559 F. App'x 500, 506 (6th Cir. 2014) (citing *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009)).

## II.      **Defendant's Objections to Plaintiff's RSUMF**

FB requests the Court disregard or strike a majority of Day's RSUMFs on the grounds that they are unresponsive, lengthy, and argumentative statements consisting of legal conclusions, opinions, and speculation in violation of Local Rule 56.1(b).  (D.E. 89 at 2.)  FB also accuses Day's counsel of inventing facts that are unsupported by any evidence in the record. (*Id.* at 2–3.)

### A.        Motion to Strike/Disregard

Local Rule 56.1(b) provides that non-movants "must respond to each fact set forth by the movant by either: (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purposes of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed."  Local Rule 56.1(b).  The disputed facts must be accompanied by "specific

citations to the record supporting the contention that such fact is in dispute." *Id.*   The non-movant's response "may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried." *Id.*

In this matter, Day submitted a fifty-four page RSUMF in response to Defendant's seventeen page SUMF.   He concedes that only seventeen paragraphs are undisputed for the purposes of Defendant's summary judgment motion.  (RSUMF ¶¶ 1–2, 8, 19, 26, 29, 32, 34, 37, 41–42, 46–47, 58, 61, 70, 72, D.E. 75-1.)  The rest of his responses contain a varying degree of argument, additional facts—some of which are immaterial—and speculation.  The Court has considered both Defendant's SUMF and Plaintiff's RSUMF in determining which material facts are undisputed for the purposes of this motion.   Therefore, Defendant's motion to strike is DENIED.

> B.     *Invention of Facts*

Defendant labels as false Plaintiff's statement that his employment status was changed from exempt to non-exempt in retaliation for complaining about his supervisor.  (D.E. 89 at 2.) Defendant provided copies of Day's payroll records, which denoted him as a salaried employee. (D.E. 90-3 at 3–7.)   Day responds by pointing out that discovery provided by Defendant initially listed his position as "FLSA Status – Exempt", but on August 10, 2011 the Corporate HR Manager met with him to review a revised job description listing his status as "FLSA - Non-Exempt".  (D.E. 99 at 3–5; D.E. 76-13 *and* 99-3.)  Based on this, the Court cannot conclude that Plaintiff's counsel has invented or mischaracterized this fact.

Defendant also challenges the veracity of Day's statement that the company refused to investigate allegations that a co-worker was accessing his computer.  (D.E. 89 at 3.)  Day

counters by citing to portions of the Corporate HR Manager's deposition where she testifies that she was unsure what kind of investigation, if any, was conducted into his tampering allegations. (D.E. 99 at 5.)   Plaintiff also states that FB never produced any discovery showing that an investigation was conducted.   (*Id.* at 5–6.)   Based on these submissions, the Court cannot conclude that Plaintiff's counsel has mischaracterized this fact.

*Background*

Unless otherwise noted, these facts are undisputed.  On February 18, 2010, Jerry Day, an African American male, applied for a Facilities Administrative Coordinator ("FAC") position at FB's Jackson, Tennessee facility.  (SUMF ¶ 6.)  The FAC position was created because Mitchell Hall ("Hall"), the facility's Human Resources Manager, retired in 2009.  (*Id.* ¶¶ 4–5.)  Day was interviewed by Tina Kaveney ("Kaveney"), FB's corporate Human Resources Manager, and Bob Battle ("Battle"), the Jackson, Tennessee operations manager.  (*Id.* ¶¶ 4–6.)  On June 1, 2010, Day was offered and accepted the FAC position, and received a starting salary of $45,000.  (*Id.* ¶ 7.)  He was employed as the FAC through August 13, 2012.  (*Id.* ¶ 67.)

Following his June hire, Day received a job description for the position, an employee handbook, and reviewed and signed the company's "Computer, E-mail, Internet and Communications" policy.  (*Id.* ¶¶ 8–10.)  The FAC position was classified as exempt under the Fair Labor Standards Act ("FLSA") and required Day to report directly to Battle.  (D.E. 68-2 at 9; SUMF ¶ 7.)  On July 12, 2010, Betty Schultz ("Schultz"), who was based in FB's Toledo, Ohio office, replaced Kaveney and became the corporate HR Manager for all the FB facilities, including Jackson.  (*Id.* ¶ 13.)

On August 9, 2010, Battle sent an email to the Jackson staff clarifying which duties the employees were responsible for following Day's hire.  (D.E. 68-2 at 12.)  Battle thought this

email was necessary since some of Hall's responsibilities had been assumed by other employees in the period between his retirement and Day's hire.  (*Id.*)  On February 16, 2011, Day sent an email to Schultz, complaining about employees undermining him and questioning his authority.  (D.E. 68-2 at 16.)  During this time, Battle occasionally introduced Day as the plant's Human Resource Manager and told him that he was required to be at the Jackson facility any time Battle was out of the office.  (SUMF ¶ 16.)

I.      **July 13, 2011 Complaint and First Written Warning**

On July 13, 2011, Day complained to Schultz that he was being subjected to a hostile work environment created by two co-workers, Mike Ross, an IT employee based in Glendale Heights, Illinois, and Whitney Chandler, the company's cost accountant based in Jackson, Tennessee.  (*Id.* ¶ 21.)  Plaintiff alleged that they were interfering with his work and attempting to sabotage him.  (*Id.*; D.E. 76-11 at 52–57.)  Attached to Day's complaint was a string of emails between Ross and Chandler which he admitted he accessed, reviewed, and printed without their consent.  (*Id.*; SUMF ¶¶ 21–22.)  None of these emails were addressed to Day.  (*Id.*)

On August 1, 2011, Schultz gave Day a written Policy Violation Notice for reviewing employee emails without appropriate authorization and warned him that any repeat violations would result the issuance of a final warning.  (D.E. 95-2 at 9.)  The August 1, 2011 violation stated that "[e]ven though, as an IT person, you have access to employee e-mails, you still need appropriate authorization to do an investigation into other employee e-mails.  Appropriate authorization from the HR Manager will be needed if there is to be an investigation regarding employee emails or any other IT."  (*Id.*)  Chandler and Ross received written warnings for blind-carbon copying email correspondence with Day.  (SUMF ¶ 26.)  Schultz told Day that this

written warning would remain in his personnel file for six months as per company policy. (RSUMF ¶ 24.)

## II.    July 18, 2011 Complaint

On July 18, 2011, Plaintiff sent a written complaint to Schultz asking for an investigation into Battle's creation of a hostile work environment, and that he be removed as operations manager.  (*Id.* ¶ 31; D.E. 95-2 at 16–17.)  He alleged that Battle yelled and used profanity towards him and other employees, and had intimidated him, causing stress-related illnesses.  (*Id.*)  Day recalled Battle using racially discriminatory remarks towards him and a female employee. (*Id.*)  He also accused Battle of engaging in sexual harassment towards female employees, including using pet names and informing one female employee that she would be staying in his hotel room when the two traveled on company business.  (*Id.*)  Finally, Plaintiff stated that Battle was intentionally hindering his ability to perform his duties as FAC and had threatened him with termination on several occasions.  (*Id.*)  On July 19, 2011, Schultz traveled to Jackson to conduct an investigation into the complaints, interviewing Day, Battle and other FB employees.  (SUMF ¶ 32.)

Schultz determined that Battle had not engaged in any race discrimination or harassment, but did find that his management style needed to be improved and monitored.  (*Id.* ¶ 35.)  Day would now report directly to Schultz, Battle's office was moved away from Day's, and Battle was required to attend leadership training to address his management style.  (*Id.* ¶ 36.)

## III.    November 16, 2011 Written Warning and Complaint

On October 10, 2011, Battle believed that Plaintiff might be accessing his work computer through the company's server and asked that the issue be investigated.  (SUMF ¶ 42.)  After an investigation, it was determined that Day's login had been accessing Battle's files.  (*Id.* ¶ 44.)

7

On November 16, 2011, Day was issued a "final" Policy Violation Notice for continuing to review emails and documents of the Jackson management team, copying those documents to his own computer, and doing so without appropriate authorization as was required per the August 1, 2011 written warning. (*Id.* ¶ 45; D.E. 95-2 at 73.) Day was warned that any repeat violations would result in his termination. (*Id.*) On November 16, 2011, Day sent another complaint to Schultz, alleging that he was being paid less than Hall for the same amount of work. (D.E. 76-17 at 2.)

## IV.  Spare Parts Organization/Budget Overrun and April 24, 2012 Complaint

The Glendale Heights, Illinois facility housed FB's spare parts operation ("SPO"), which was managed by Pete Kurtz ("Kurtz"). (Dep. of Bob Battle ("Battle Dep.") at 104, D.E. 76.) Sometime in 2011, the decision was made to relocate the SPO to the Jackson, Tennessee facility. (*Id.* at 211.) The Jackson facility would hire temporary employees from local employment agencies on an as-needed basis to help with the transition. (*Id.* at 214–15.)

The hiring process for temporary employees involved the production manager informing the operations manager that more help was needed. (*Id.*) That request would then be taken to the FAC, who would contact the employment agency to arrange for an employee to be sent over. (*Id.*) The process was informal and usually involved no written paperwork other than the FAC's email to the employment agency. (*Id.* at 215–16.) This was in contrast to the hiring of permanent employees, which required a requisition approval process and a sign off by either the operations manager or production manager and FB's Vice President and General Manager, Thomas White ("White"). (*Id.* at 216–17.) After the relocation, Kurtz was named operations manager for the Jackson facility on April 1, 2012. (*Id.* at 229.) Battle had been promoted to

manufacturing manager in 2011, and director of operations in 2012.  (*Id.*at 77.)  He still kept an office in Jackson even though he traveled extensively.  (*Id.* at 31.)

In May 2012, White reviewed FB's budget and asked Battle to investigate why temporary labor costs were so high in the Jackson facility.  (SUMF ¶ 50.)  Battle gathered data on the temporary employees' pay rates and overtime hours worked in SPO.  (Battle Dep. at 226–29, D.E. 76.)  He directed Kurtz to conduct an investigation into the temporary employees' pay rates.  (*Id.* at 229–30.)  It was discovered that certain temporary employees' rates of pay were unusually high, and that Day had made those adjustments directly with the employment agencies.  (*Id.* at 240–41; Dep. of Jerry Day ("Day Dep.") at 702–03, D.E. 76-10.)

FB had no written policy that required FACs to obtain written approval from the operations manager before approving a temporary employee pay increase, but Kurtz considered it a "common business practice" that approval should be sought before the FAC adjusted a temporary employee's salary.  (Dep. of Pete Kurtz ("Kurtz Dep.") at 132–33, D.E. 78-15; Battle Dep. at 259, D.E. 76.)  On June 27, 2012, Kurtz and Schultz met with Day to discuss the pay increases.  (SUMF ¶ 56.)  At this meeting, Day admitted to making the adjustments and claimed that he had been given this authority by Kaveney when he was hired.  (*Id.*)

On April 24, 2012, Day sent Schultz another complaint alleging that Battle was not supporting him in a dispute with a third-party vendor.  (D.E. 95-2 at 87.)  According to Plaintiff, Battle failed to include him in staff meetings and communications and violated federal law in his handling of internal hiring decisions.  (*Id.*)  Day threatened to quit unless there was improvement in the work environment.  (*Id.*)

**V.    June 28, 2012 Complaint and July 6, 2012 EEOC Charge**

On June 28, 2012, the day after Kurtz and Schultz met with Day to discuss the temporary employee raises, he requested another investigation because he believed Battle was still creating a hostile work environment and retaliating against him.  (SUMF ¶ 58; D.E. 95-2 at 95–97.) Plaintiff alleged that Battle refused to speak to him at work, undermined his decisions, and failed to address the temporary employee budget overrun.  (*Id.*)  On July 6, 2012 [1], Day filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of race, retaliation based on race, and a hostile work environment. (D.E. 78-20.)

## VI.   August 13, 2012 Termination

On July 13, 2012, Battle and Kurtz recommended that Day be terminated for approving unauthorized pay increases for temporary employees.  (SUMF ¶ 62.)   After reviewing the investigation, Schultz agreed.  (*Id.* ¶ 64.)  The recommendation was given to White, who made the final decision to fire Day.  (*Id.* ¶ 65.)  White concluded that Day's unilateral adjustment of these wages was unauthorized and outside the scope of his own authority.  (*Id.*)  White also noted Day's two prior written warnings supported the termination decision.  (*Id.*) Day's employment ended on August 13, 2012.  (D.E. 78-14.)

On July 25, 2012 and September 14, 2012, Day submitted amended charges to the EEOC, which issued a right-to-sue notice on February 28, 2013.  (D.E. 68-3 at 6–9.)  He brought suit on March 12, 2013, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.*, the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304, and Tennessee common law.  (D.E. 1.)

*Legal Standard*

---

[1] Day signed the charge on July 3, 2012, but it was not received by the EEOC until July 6, 2012.

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court is to "view facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party." *Burns v. Mahle Engine Components USA, Inc.*, ___ F. App'x ____, No. 13-2324, 2015 WL 1427147, at *3 (6th Cir. Mar. 31, 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). It is not to "weigh evidence, assess credibility of witnesses, or determine the truth of matters in dispute." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014) (quoting *Anderson*, 477 U.S. at 251–52).

The moving party "has the initial burden of showing the absence of a genuine dispute as to a material fact." *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 520 (6th Cir. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the motion is properly supported, "the opposing party must go beyond the contents of its pleadings to set forth specific facts that indicate the existence of an issue to be litigated." *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008) (citation omitted). The nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson*, 477 U.S. at 248. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* A court must grant summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

*Analysis*

## I.      Race Discrimination

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). So does the THRA. *See* Tenn. Code Ann. § 4-21-401(a)(1). The analysis of claims brought under both statutes is identical. *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008). Plaintiffs can establish a race discrimination claim "by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)).

When claims, like the ones here, are based on circumstantial evidence, courts use the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* Under this framework, the "[p]laintiff first carries the burden of establishing a *prima facie* case" by showing that "1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class." *Id.* at 727. Once a plaintiff establishes a prima facie case, the burden "'shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext.'" *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir.

2014) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).   To survive summary judgment, a plaintiff only has to "'produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale.'"   *Id.* (quoting *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012)).

Day recalls several incidents of race discrimination by FB:  (1) receiving less pay than Hall, the Caucasian employee he replaced; (2) refusing to change his job title from FAC to HR Manager; (3) refusing to place him on the company's "high potential" list; (4) giving him two undeserved written warnings; and (5) terminating his employment.  (D.E. 75 at 3.)  As to each incident, FB takes the position it is entitled to summary judgment because Day has either not made out a prima facie case, or has not shown that FB's legitimate, non-discriminatory reasons were pretextual.  (D.E. 71-1 at 6–17.)[2]

A.     *Pay Disparity*[3]

The United States Supreme Court has held that disparity in pay between an African American employee and a similarly situated Caucasian employee can serve as the basis for a Title VII lawsuit.  *Bazemore v. Friday*, 478 U.S. 385, 395–96 (1986).  "A plaintiff may establish a *prima facie* case of wage discrimination by showing an employer paid higher wages to an employee outside of the protected class for substantially equal work."  *Woods v. FacilitySource LLC*, No. 2:13-CV-621, 2015 WL 247980, at *6 (S.D. Ohio Jan. 20, 2015), *appeal docketed*, No. 15-3138 (6th Cir. Feb. 19, 2015) (citing *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 826–28 (6th Cir. 2000)).  "[T]he analysis of unequal pay for equal work is essentially the same under

---

[2] Defendant's memorandum in support of its motion for summary judgment contains a table of contents and a table of authorities.  Any citations by the Court to the memorandum are based on the PageID number and not the document's page number.

[3] The Court notes that Plaintiff quoted *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000) as stating "[f]or the purposes of Title VII . . . a lower salary for the same job duties . . . [is] considered an adverse employment action." *Id.* at 562.  The Court was unable to find this quote in the *Nguyen* opinion, any other Sixth Circuit decision, or any decision from the other Circuits.

both the Equal Pay Act [("EPA")] and Title VII." *Hicks v. Concorde Career Coll.*, 695 F. Supp. 2d 779, 791 (W.D. Tenn. 2010) (citing *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981)); *see also Beck-Wilson v. Principi*, 441 F.3d 353, 369 (6th Cir. 2006) ("A Title VII claim of wage discrimination parallels that of an EPA violation insofar as it incorporates the EPA's affirmative defenses.").

"If a plaintiff establishes a *prima facie* case of wage discrimination under the EPA [or Title VII], an employer can establish an affirmative defense by showing that its compensation decision was based on (1) seniority; (2) merit; (3) a system which measures earnings by quantity or quality of production; or (4) any factor other than [race]." *Mallison v. Haworth, Inc.*, 488 F. App'x 88, 91 (6th Cir. 2012) (citations and internal quotation marks omitted). "The employer bears the burden of establishing that its proffered explanation for the wage differential is true. If it does, the burden returns to the plaintiff to show that the employer's explanation is pretextual." *Id.* (citations omitted).

FB asserts that paying Day less than Hall is not actionable race discrimination since it made the business decision not to replace Hall with another Human Resources Manager, but instead created a position with a different title, responsibilities, and pay rate. (D.E. 71-1 at 9; D.E. 89 at 6–7.) Further, the two men are not similarly situated because Hall was employed with the company for several years and held a management-level position with supervisory authority, in contrast to Day's position, which had no supervisory authority. (*Id.*) Plaintiff maintains that FB should be judicially estopped from insisting that he was not a manager or supervisor, since his position was categorized as exempt under FLSA. (D.E. 75 at 5.) Day also claims that he and Hall had the same duties, job descriptions, and reported to the same superiors, making him an appropriate comparator. (*Id.* at 5–6.) Day states that Kaveney told him at the time of his hire

that he was completely in charge of the HR and IT responsibilities in Jackson and that he was introduced by Battle and Kaveney as the facility's HR Manager.  (*Id.*)

### 1.   *Judicial Estoppel*

Day's reliance on judicial estoppel against FB's position that he was not a supervisor or manager is based on his listing as an "exempt" employee under FLSA.  (D.E. 75 at 5–6.) Defendant responds that FLSA's exemptions are not limited to management-level positions, but also include employees who primarily handle computer-related duties, like Day did for the Jackson facility.  (D.E. 89 at 7–8.)  Plaintiff contends that his exempt status cannot be founded on his IT duties because 29 C.F.R. § 541.400(a)–(b) states that the IT exemption only applies to employees whose primary duties were computer related, while IT was only part of his responsibilities.  (D.E. 99 at 12–14.)

The United States Supreme Court has summarized the doctrine of judicial estoppel as follows:  "'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'"  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680. 689 (1895)).  Judicial estoppel "'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'"  *Id.* (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)).

The rule's purpose is to protect the integrity of the judicial process by preventing litigants from changing positions when beneficial.  *Id.* at 749–50.  The Supreme Court has set forth three factors that courts should consider before deciding if judicial estoppel applies:  (1) whether a

litigant's later position is "clearly inconsistent" with an earlier position; (2) whether the party has "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) would the party asserting an inconsistent position "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750 (internal quotation marks and citations omitted). "Judicial estoppel must be cautiously applied to avoid impingement on the truth-seeking function of the courts." *Trimas Corp. v. Meyers*, 572 F. App'x 347, 353 (6th Cir. 2014) (citing *Lorillard Tobacco Co. v. Chester, Wilcox & Saxbe*, 546 F.3d 752, 757 (6th Cir. 2008)).

Day has not explained how FB's argument that he was not a manager or supervisor like Hall is "clearly inconsistent" with an earlier position the company has taken in this, or any other litigation. *Maine*, 532 U.S. at 749–50. While Plaintiff contends that being listed as FLSA-exempt can only mean that he was a manager or supervisor, the exemption under 29 U.S.C. § 213(a)(1) also includes employees who work in a bona fide administrative capacity. *See Renfro v. Indiana Michigan Power Co.*, 370 F.3d 512, 516–19 (6th Cir. 2004) (demonstrating the analysis used for determining whether the administrative exemption applies to certain types of employees). He has not alleged, nor has FB disputed, any violation of the federal wage laws in this, or any other litigation. Day's request for judicial estoppel is without merit and DENIED.

### 2.   *Similarly Situated Employee*[4]

"In a Title VII case where the plaintiff seeks to compare [himself] to another employee, [he] must prove that all relevant aspects of [his] employment situation were similar to those of the other employee." *Conti v. Universal Enters., Inc.*, 50 F. App'x 690, 699 (6th Cir. 2002)

---

[4] In his deposition, Day identified Schultz and other members of the Jackson, Tennessee management team as appropriate comparators for the purposes of his wage discrimination claim. However, he did not reference these employees in his response brief. As such, that argument is waived.

(citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).   The Sixth Circuit addressed the requirements for finding two employees to be similarly situated in the disciplinary context in *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992) and *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998).   However, the factors set forth in those cases "have little, if any, relevance to the inquiry of whether employees are similarly-situated for purposes of resolving a [race]-based wage discrimination claim under Title VII." *Conti*, 50 F. App'x at 699.   The relevant factors concerning similarly situated employees in order to decide a wage discrimination claim under Title VII include

> those aspects of the employment situation which must be examined in determining whether the plaintiff and a [Caucasian] employee performed "equal work" as that term is defined for purposes of the Equal Pay Act.   Thus, the relevant factors include the skill, effort, and responsibilities of each job and the working conditions under which each job is performed.

*Id.*   "Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated."   *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004) (citation omitted).

Courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich*, 154 F.3d at 352.   In this context, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated; rather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects."   *Id.* (emphasis in original) (citation and internal quotation marks omitted).

### a.   Mitch Hall

Day alleges that he and Hall are similarly situated because their job descriptions were similar, they reported to the same supervisor, he was introduced as the plant's HR Manager, was told by Battle and Kaveney that he was responsible for HR, and was categorized as an exempt employee under FLSA.  (D.E. 75 at 5–6.)  FB asserts that Hall is not an appropriate comparator because Plaintiff was hired as a FAC after the company made the business decision to change how HR functions were handled at each facility.  (D.E. 71-1 at 9.)  Further, FB notes that Day's position was classified as administrative with no supervisory function, while Hall, who had years of experience with Defendant, had supervisory authority.  (D.E. 89 at 6–7.)

Hall is not an appropriate comparator for the purpose of Day's wage discrimination claim.  He has failed to provide any evidence regarding Hall's tenure at FB, what his responsibilities were, or what prior experience Hall had.  Day testified that Tony Walker, a quality manager, could offer testimony corroborating that he performed all of the same functions as Hall, (Day Dep. at 751–52, D.E. 76-10), but did not provide an affidavit or declaration from the witness.  Day also offers Schultz' testimony that "there's a great deal of personnel issues that [she doesn't] handle for the Jackson plant," as evidence that he was responsible for most of the HR duties in Jackson.  (D.E. 75 at 5.)  In her deposition, Schultz was being questioned about the company's policies for employee leave requests under the Family Medical Leave Act ("FMLA"), COBRA benefits, and worker's compensation claims.  (Schultz Dep. at 174–79, D.E. 75-5.)  She testified that an employee would complete a form and send it directly to Graco.  (*Id.* at 177–78.)  This is not evidence that Day was the HR Manager of the Jackson facility, as Schultz also testified that during the period Day was employed, his only role in these processes was to confirm the employee completed the form.  (*Id.* at 175–76.)

Day also notes that Kaveney told him he was in charge of "everything" related to HR and IT in the Jackson facility when he was hired.  (D.E. 75 at 5.)  However, this testimony does not explain what "everything" means for a FAC as compared to "everything" Hall was responsible for as HR Manager.  Day states that Battle sent an organizational announcement on May 19, 2010 introducing him to the staff, stating that "Jerry will be responsible for Human Resources and IT functions here in Jackson."  (*Id.*; D.E. 76-3 at 11.)   Again, this does not help the Court determine whether Day and Hall were similar in all relevant aspects.  *Ercegovich*, 154 F.3d at 352.

The only other proof Day has submitted are his and Hall's year-end "goals and objectives" handout they each received from FB.  However, "[t]he pertinent inquiry must focus on the actual requirements and performance of the jobs in question."  *Conti*, 50 F. App'x at 697. Like the plaintiff in *Conti*, Day has "made only a conclusory allegation . . . that [his] job duties were substantially equal to those of [a] comparable [Caucasian] employee[] that [was] paid significantly more."  *Id.* (quotation marks omitted); *Hicks*, 695 F. Supp. 2d at 793 (granting summary judgment in favor of the defendant because the plaintiff failed to demonstrate that his comparators were similarly situated).  As such, he has not shown that he and Hall were similarly situated employees and has not set forth a prima facie case of wage discrimination.

b.   <u>Cheryl Eckert</u>

Day also points to Cheryl Eckert, an HR assistant in the company's Illinois office, as an appropriate comparator who was paid more than him even though she performed mostly clerical duties, had no IT responsibilities, or college degree.  (D.E. 75 at 9.)

*3.   **Affirmative Defenses***

Even if Day could establish a prima facie case of wage discrimination, FB contends it was justified in paying Hall a higher salary because he worked for the company for several decades and had supervisory authority, while Day's employment lasted less than two years and his FAC position had no such responsibility.  (D.E. 71-1 at 9; D.E. 101-1.)  FB also contends it was justified in paying Eckert a higher salary because she had been with the company since 1993.  (SUMF ¶ 12; D.E. 89 at 12.)  These affirmative defenses shift the burden back to Day to show they are actually pretextual.

### 4.    *Pretext*

Plaintiff could rebut FB's legitimate, non-discriminatory reasons for paying him less than Hall and Eckert "'by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the pay disparity], or (3) that they were insufficient to motivate [the difference in pay].'"  *Shazor*, 744 F.3d at 959 (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012)).

Day argues that FB's proffered reason for paying Hall more—the additional duties he performed—is untrue, (D.E. 75 at 12), but has not offered any evidence elaborating on what Hall's job actually entailed.  Plaintiff cannot show that the difference in pay between him and Hall was not actually based on Hall's position having a supervisory role and Hall's substantial seniority.  *See Hicks*, 695 F. Supp. 2d at 792 ("However, even if the Court were to find that Plaintiff has made out his prima facie case, the Defendant is entitled to summary judgment because it has established an affirmative defense that the wage differential is due to a factor other than race.  [The comparator] was a senior representative with a higher start goal per year than Plaintiff.  Additionally, [the comparator] had fifteen (15) years of verifiable experience in recruiting, propriety sales, and management and a doctorate degree, whereas Plaintiff had only

20

nine months of verifiable experience.  The Plaintiff has presented no evidence to suggest that Defendant's affirmative defense is pretextual.").  Similarly, Plaintiff cannot show that the difference in pay between he and Eckert was also not based on her substantial seniority.

While Day claims that FB failed to preserve documents relating to Hall's tenure with FB, (D.E. 75 at 32), it is undisputed that Defendant notified Plaintiff's counsel that Hall's employment records were no longer in its possession or control.  (D.E. 90-2 at 9–10; Battle Dep. at 194–95, D.E. 76.)  Day is not excused from failing to pursue other means of discovery to obtain Hall's employment records, such as deposing Hall, or subpoenaing his employment records from the other entity.

Day has failed to rebut FB's affirmative defenses for paying Hall and Eckert a higher salary.  Therefore, Defendant's motion for summary judgment on this claim is GRANTED.

    B.    *Job Title*

Day insists that FB's refusal to give him the title of Human Resources Manager is race discrimination actionable under Title VII.  (D.E. 75 at 6–7.)  FB retorts that its refusal to do so was not an adverse employment action.  (D.E. 71-1 at 10–11.)  As part of the prima facie case, a plaintiff alleging race discrimination "must demonstrate that he has suffered an adverse employment action."  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (quotation marks omitted).  "'An adverse employment action in the context of a Title VII discrimination claim is a materially adverse change in the terms or conditions of employment because of the employer's actions.'"  *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 625 (6th Cir. 2013) (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007)). Examples include "'hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits.'"   *White*, 533 F.3d at 402

(quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).

There is no evidence that FB's refusal to give Day the title of HR Manager has resulted in

a "materially adverse change in the terms or conditions of [his] employment . . . ."   *Kuhn*, 709

F.3d at 625.   Day applied for the FAC position and was hired as such.   He retained that title

throughout his employment with Defendant.   Plaintiff's subjective belief that his job was

misclassified resulting in employees not respecting his authority, (Day Dep. at 103–04, D.E. 76-

7), is irrelevant, as the FAC's job description stated that the position had no supervisory

authority.   (D.E. 76-13 at 3.)   "A 'bruised ego' or a 'mere inconvenience or an alteration of job

responsibilities' is not sufficient to constitute an adverse employment action."   *Leavey v. City of

Detroit*, 467 F. App'x 420, 425 (6th Cir. 2012) (quoting *White v. Burlington N. & Santa Fe Ry.

Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (en banc)).   Neither is "dissatisfying an employee."   *Id.*

(citing *Spees v. James Marine Inc.*, 617 F.3d 380, 391 (6th Cir. 2010)).   Therefore, Defendant's

motion for summary judgment on this claim is GRANTED.

C.        *"High Potential" List*[5]

Day states that the company's "high potential" list consisted of employees who could

possibly move up the corporate ladder, and that FB's refusal to put him on the list was an

adverse employment action because it hindered his professional growth.   (D.E. 75 at 6–7.)   He

did not explain what qualifications were necessary before an employee was eligible to be placed

on the list, but noted that two Caucasian employees were included.   (*Id.*)   FB responds that this

omission was not a materially adverse action because it did not cause a change in the terms or

---

[5] Defendant moved for summary judgment on Day's claims that he was continually denied promotions, and that he was purposely misled by FB when it failed to provide him opportunities to help with other locations.  (D.E. 71-1 at 12.)  As Day did not respond to these arguments in his response or sur-reply, the Court finds these claims have been abandoned.  Therefore, Defendant's motion for summary judgment on these issues is GRANTED.

conditions of his employment.  (D.E. 71-1 at 11–12.)  FB's refusal to place Day on the "high potential" list is the kind of "mere inconvenience" that is insufficient to constitute an adverse employment action.  *Deleon v. Kalamazoo Cnty. Road Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014) (quotation marks and citation omitted).  While Plaintiff may have subjectively believed that his failure to be on the list thwarted his growth potential with the company, he has presented no evidence that he was passed up for any promotion because of the non-listing.

FB also insists that it had a legitimate, non-discriminatory reason for omitting Day from this list—he was unqualified.  The "high potential" list, according to Defendant, included only those employees who had the potential for moving into a general's manager job within the next two to three years.  (D.E. 71-1 at 11–12; Dep. of Tom White "(White Dep." at 65, D.E. 70-13.) White recalled that Day was not qualified because he had no sales or management experience, and had been with the company for less than two years.  (*Id.* at 66.)  Day testified that he tried to apply for other positions within the organization, but admitted there was a legal hold on all employee transfers during this time due to a possible sale to Graco and pending FTC litigation. (Day Dep. at 666–67, D.E. 76-10.)

While Day states that FB's reasons for omitting him from the list were false, (D.E. 75 at 12–13), he has not demonstrated that the company's qualification requirements had no basis in fact, or were somehow pretext for race discrimination.[6]  His conclusory allegations as to the value of being on the "high potential" list are insufficient to survive summary judgment.  *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) ("In order to survive summary

---

[6] Day contends that Tate Scott and Whitney Chandler are appropriate comparators for his claim arising from the company's "high potential" list.  (D.E. 75 at 9–10.)  The only argument he makes is that Battle sent an email listing him and Chandler as "managers."  (*Id.* at 6.)  This is insufficient to show that Day and these employees were similarly situated.

judgment, Plaintiff cannot rely on conjecture or conclusory allegations.").   Therefore, Defendant's motion on this claim is GRANTED.

    D.    *Written Warnings*

Plaintiff avers that FB's issuance of two written reprimands were adverse employment actions because they served as part of the basis for his eventual termination.  (D.E. 75 at 7–8.)  In response, FB maintains that the written warnings did not result in any tangible loss to Day, and therefore cannot be adverse actions under existing case law.  (D.E. 89 at 9–10.)  FB also argues that it had a legitimate, non-discriminatory reason for issuing the warnings and there is no evidence those reasons were pretextual.  (*Id.* at 10–12.)

    *1.*    **Adverse Employment Action**

Typically, written reprimands are not "materially adverse employment action[s] unless [they are] accompanied by a loss such as demotion or salary reduction[.]"  *Agrawal v. Montemagno*, 574 F. App'x 570, 576–77 (6th Cir. 2014).  FB's stated reasons for terminating Day's employment were his "unilateral adjustment of compensation for several temporary employees" and "past misconduct."  (D.E. 78-14.)  Schultz, Battle and Kurtz testified that the past misconduct included the incidents resulted in Day receiving the two written reprimands. (Kurtz Dep. at 145, D.E. 78-15; Schultz Dep. at 30–31, D.E. 75-7; Battle Dep. at 569, D.E. 76-1.)  White, who approved Day's discharge, was aware of the two write-ups when he made his decision.   (White Dep. at 24, D.E. 75-2.)  Plaintiff has sufficiently linked the two written warnings to his termination, a "tangible employment action" that he was "in jeopardy of suffering, because of the [written warnings]."  *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 789 (6th Cir. 2000).  Because Day has established a prima facie case of race discrimination, the burden of production shifts to FB.

### 2.    *Legitimate, non-discriminatory reason*

FB states that it had legitimate, non-discriminatory reasons for issuing the two written warnings—namely that Day admitted to accessing Ross's and Chandler's work email accounts without permission, and that the company concluded, after investigation, that Day's computer had been accessing Battle's electronic files through the company server.  (D.E. 89 at 10–11.) The burden of production shifts back to Day to show that these non-discriminatory reasons actually mask discriminatory animus on the part of FB.

### 3.    *Pretext*

As noted, Plaintiff can rebut FB's legitimate, non-discriminatory reasons for issuing the written warnings by three different methods:  (1) they had no basis in fact; (2) they did not actually motivate the written warnings; or (3) they were insufficient to motivate the written warnings.  *Shazor*, 744 F.3d at 959 (citation omitted).  While not stated clearly in his brief, it appears he is attempting to establish pretext by arguing that FB's reasons were insufficient to motivate the two written warnings.  (D.E. 75 at 13.)  In doing so, Plaintiff alleges that he had the authority to access Chandler and Ross's emails in the first instance, and as to the second, he insists that he provided proof that Ross was remoting into his computer and pretending to be him to sabotage his career.  (*Id.*)  He also states that the discriminatory atmosphere at FB supports his argument that Defendant's reasons were pretextual.  (*Id.* at 18–21.)

### a.    <u>Insufficient to Motivate the Written Warnings</u>

A plaintiff alleging that an employer's decision was insufficient to motivate the adverse employment action "is required to show by a preponderance of the evidence that 'other employees, particularly employees not in the protected class, were not [given written warnings] even though they were engaged in substantially identical conduct to that which the employer

contends motivated its [decision to give written warnings to] [ ] [Day].'" *Rhoades*, 559 F. App'x at 505 (quoting *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994), *overruled on other grounds by Geiger v. Tower Auto.,* 579 F.3d 614 (6th Cir. 2009)). "A showing of the third type of pretext is a direct attack on the credibility of the employer's proffered motivation for disciplining the plaintiff, and, if shown, 'permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case.'" *Chattman*, 686 F.3d at 349 (quoting *Manzer*, 29 F.3d at 1084).

As to the first written reprimand, Day fails to offer any employees outside of his protected class that engaged in substantially identical conduct without receiving a written warning. (D.E. 75 at 10.) Chandler and Ross would seem to be appropriate comparators, however, it is undisputed that they both received written warnings for actions arising out of this incident, negating Day's contention that he was treated differently because of his race. He cannot establish that FB's reasons for issuing the first written warning were pretextual.

As to the second warning, Plaintiff identified Ross as the similarly situated Caucasian employee who avoided punishment even though Day insists that Ross was the one who was actually remoting into his computer and accessing Battle's work files. (*Id.* at 10, 13; Day Dep. at 350–51, D.E. 76-8.) Day's proof on this point is a series of screenshots that possibly show the logins "Anonymous" and "MROSS" accessing Day's work computer. (D.E. 77-20.)

However, to establish that the company's reason was insufficient to motivate the written warnings, Day must show that he and Ross were similarly situated. *See Rutherford v. Britthaven, Inc.*, 452 F. App'x 667, 671 (6th Cir. 2011) ("A plaintiff may establish pretext by showing that the proffered nondiscriminatory reasons were insufficient to motivate the [written warnings]. Such insufficiency is often established through evidence demonstrating 'that other

employees, particularly employees not in the protected class, were not [given written warnings] even though they engaged in substantially identical conduct to which the employer contends motivated [the written warnings] of the plaintiff.'" (quoting *Manzer*, 29 F.3d at 1084).  To be similarly situated,

> "the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

*Id.* (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000)).

Day has not offered any evidence explaining how he and Ross were subject to the same standards or engaged in the same conduct, such that FB's reasons for issuing the second written reprimand to Day and not Ross was pretextual.  Ross and Day were not subject to the same standards since the company directed Ross, as its IT analyst, to monitor Day's computer activity following his first written warning.  (Schultz Dep. at 53–54, D.E. 75-7.)  Ross's role as an IT analyst is the kind of differentiating circumstance that distinguishes his conduct from Day's and explains why FB gave only Day a written warning.  Aside from Day's belief that Ross was using his login to access Battle's files, and a series of screenshots showing an "MROSS" logging into his computer, there is no other evidence supporting his allegation that he was treated differently because of his race.  Because Day cannot show that a similarly situated Caucasian employee engaged in like conduct, but did not receive a written warning, Defendant's motion for summary judgment on this claim is GRANTED.

## E.    Termination

The parties do not dispute that Day can meet the first three elements of a prima facie race discrimination claim arising from his termination.  (D.E. 89 at 5.)  However, FB insists that Day

was not treated differently or replaced by similarly situated Caucasians, and there is no evidence that the company's legitimate, non-discriminatory reasons for terminating his employment were pretextual.  (D.E. 71-1 at 13–17; D.E. 89 at 12–16.)

### 1.      *Treated differently than or replaced by similarly situated Caucasians*

Plaintiff alleges that he was the only employee punished for the SPO budget overrun, and that Caucasian employees like Battle and Kim Quick, the SPO production supervisor, did not suffer any repercussions.  (D.E. 75 at 10.)  Alternatively, he argues that FB replaced him with two Caucasian employees following his termination.  (*Id.* at 10–11.)  FB states that one of the two Caucasian employees hired after Day's termination was an administrative clerk who was assisting the Jackson management staff with HR and additional issues, and the other, an IT analyst.  (D.E. 89 at 12–13.)

As noted, the fourth element of a prima facie race discrimination claim requires the plaintiff to show that "he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class."  *Laster*, 746 F.3d at 727.  Here, drawing all reasonable inferences in favor of Day, the Court finds that he has established a prima facie case of race discrimination.  *See Vincent v. Brewer Co.*, 514 F.3d 489, 496 (6th Cir. 2007) ("[T]his court has consistently held that a showing that a plaintiff's replacement was not a member of the plaintiff's protected class was sufficient to satisfy the fourth element [of a prima facie race discrimination claim].").   A jury could conclude that Day was replaced by the two Caucasian employees that were hired following his termination. The burden of production shifts to FB to provide a legitimate, non-discriminatory reason for his termination.   FB justified terminating Plaintiff because of his admission that he authorized pay

increases for certain temporary employees.  (D.E. 89 at 13.)    The burden now shifts to Day to show these reasons are pretextual.

### 2.      Pretext

Plaintiff contends that FB's reasons for terminating his employment were false and were actually motivated by his complaints about racial discrimination.  (D.E. 75 at 11.)  Again, he can rebut FB's legitimate, non-discriminatory reasons by showing they (1) had no basis in fact, (2) did not actually motivate his termination; or (3) were insufficient to motivate his termination. *Shazor*, 744 F.3d at 959 (citation omitted).  Plaintiff attempts to rebut the company's reasons and demonstrate pretext by arguing they had no basis in fact, or were insufficient to motivate a termination.  (D.E. 75 at 13.)

### a.      Insufficient to Motivate Discharge

Again, a plaintiff attempting to demonstrate pretext under this third prong must show that "'other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge of [Day].'"  *Rhoades*, 559 F. App'x at 505 (quoting *Manzer*, 29 F.3d at 1084, *overruled on other grounds by Geiger v. Tower Auto.,* 579 F.3d 614 (6th Cir. 2009)).

FB's stated justification for terminating Day's employment—his unilateral increase of the temporary employees' pay rates in violation of company policy—suffers from several defects that would allow a jury to believe that those reasons were insufficient to motivate his discharge. *See Manzer*, 29 F.3d at 1084.  Battle, the operations manager during part of Day's employment, testified that any pay raises for temporary employees have to be approved first by the operations manager.  (Battle Dep. at 259, D.E. 76.)  Battle recalled that the process for giving pay increases to temporary employees involved a production manager going to the FAC to request a raise, and

to have it approved by the operations manager before it was sent to the employment agencies. (*Id.* at 223–24.) He stated that there was no company requirement or policy that any paperwork be completed that memorialized either the pay raise request from the production managers or to obtain the operation manager's approval. (*Id.* at 224.) Battle speculated that the only tangible evidence might be an email from the FAC to the employment agency requesting the increase. (*Id.* at 224–25.) Kurtz, who became operations manager on April 1, 2012, was asked

Q:      Was there ever any written policy that said that Jerry Day had to get authority from the operations manager to approve a change in the rate of pay of a temporary employee if that had been requested by the production manager?

A:      You said "written," right?

Q:      Written.

A:      I'm not aware of any.

Q:      You're just saying that's a common sense policy?

A:      It's common business practice.

Q:      If Jerry had been the HR manager, would he have had authority to make adjustments of temporary employees' hourly rate of pay at the request of production managers?

A:      Not solely, no.

Q:      And "not solely" means he would have to check –

A:      He would have to review it upwards and get approval, yeah, present the case.

Q:      Would he have to get that approval in writing, or could it be given orally?

A:      I think it could probably be given verbally, sure.

(Kurtz Dep. at 132–33, D.E. 78-15.) At his deposition, Day was asked

Q:      When was the first time you gave a pay raise to a temporary employee?

MS. LUNA:   Object to the form.

30

> A:    I cannot recall.  All I can remember is Tina [Kaveney] telling me, you know, You're in charge of the temps and temps' pay.  I can't recall when an increase was given.

(Day Dep. at 702, D.E. 76-10.)   Kurtz, who was investigating the temporary employees' pay rates, testified that he called Kaveney on July 2, 2012, and that she stated she never told Day he could do pay increases on his own or that he had authority to do that.  (Kurtz Dep. at 167, D.E. 78-15.)  This would raise a disputed material fact resulting in the denial of Defendant's motion for summary judgment on this claim.

However, "the fact that the policy was unwritten does not mean that it is an unfit standard to which to hold employees.  The inquiry in such cases is not about what the policy actually entailed, but whether the same action was taken by multiple similarly-situated employees with regard to the workplace policy and if they were treated differently in accordance with their membership in a protected class."  *Quintanilla v. AK Tube LLC*, 477 F. Supp. 2d 828, 834 (N.D. Ohio 2007); *Rutherford*, 452 F. App'x at 671 ("A plaintiff may establish pretext by showing that the proffered nondiscriminatory reasons were insufficient to motivate the discharge.  Such insufficiency is often established through evidence demonstrating 'that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to which the employer contends motivated its discharge of the plaintiff.'") (quoting *Manzer*, 29 F.3d at 1084).  Again, to be similarly situated,

> "the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

*Id.* (quoting *Smith*, 220 F.3d at 762).

Recently, in *Pigott v. Battle Ground Acad.*, 909 F. Supp. 2d 949 (M.D. Tenn. 2012), the district court found that the plaintiff had demonstrated pretext in the decision to terminate her employment because the defendants' "inability to articulate and implement consistent policies" left factual disputes that could permit a jury to discredit its nondiscriminatory reason for terminating plaintiff's employment. *Id.* at 963. Specifically, the district court found that the policy relied on by the defendants in terminating plaintiff's employment was not written and was applied in an inconsistent manner. *Id.* at 963–64. However, the plaintiff in *Pigott* had also provided evidence that the defendants' policy had not been applied consistently to other, similarly situated employees. *Id.* at 964.

Here, by contrast, Day has not shown how other, similarly situated employees outside the protected class avoided punishment for increasing temporary employees' pay rates even though he was terminated. He seeks to compare himself to two Caucasian employees, Battle and SPO production manager Kim Quick, (D.E. 75 at 10), but there is no evidence that either of them served as FB's point-of-contact for the employment agencies like Day did. Plaintiff has not shown that these two employees ever approved a pay raise for a temporary employee, or that they had any direct interaction with the employment agencies. Because these two employees did not engage in substantially identical conduct, Day cannot show that FB's legitimate, non-discriminatory reasons were insufficient to motivate his discharge.

b.  <u>No Basis in Fact</u>[7]

A plaintiff seeking to demonstrate pretext by alleging an employer's decision had no basis is fact is essentially "an attack on the credibility of [an employer's] reason and 'consists of showing that the employer did not actually have cause to take adverse action against the

---

[7] Defendant's memorandum did not reference the "honest belief" rule in the section addressing Plaintiff's race discrimination claim. However, the Court will consider the application of the rule here because both sides fully briefed that issue as it relates to Plaintiff's retaliation claim.

employee based on its proffered reason, and thus, that the proffered reason is pretextual.'" *Tibbs v. Calvary United Methodist Church*, 505 F. App'x 508, 513 (6th Cir. 2012) (quoting *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012)); *Manzer*, 29 F.3d at 1084 (holding that a plaintiff must put forth "evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are factually false") (citation and internal quotation marks omitted).  "At the pretext stage of the analysis, [Day] must show 'more than a dispute over the facts upon which the discharge was based.'" *Curry v. Brown*, ___ F. App'x _____, No. 13-6320, 2015 WL 1783800, at *7 (6th Cir. Apr. 21, 2015) (quoting *Seeger*, 681 F.3d at 285). Instead, a "[p]laintiff must put forth evidence that [the] Defendant[ ] did not 'honestly believe' in the given reason for Plaintiff's termination." *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007).  Day testified that when he was hired, Kaveney told him he had the authority to handle all pay raises for temporary employees—and that this unilateral power was subsequently confirmed by Battle.  (D.E. 75 at 13.)  Because of this alleged authority, confirmed by Battle, Day contends FB's termination of him for increasing the temporary employees' salaries based on the violation of some unwritten company policy was false and pretextual.  (*Id.* at 17–18.)

iv.    Honest Belief Rule

However, even if Day has put forth evidence that would allow a jury to reject FB's proffered reasons for terminating his employment, the company believes it is still entitled to summary judgment because Kurtz, Schultz, White and Battle all had an honest belief that Day had raised the temporary employees' wages without first obtaining permission from the operations manager, which, along with his previous misconduct, justified his termination.  (D.E. 89 at 21–23.)

33

The Sixth Circuit utilizes a modified version of the "honest belief" rule. "The ground rules for application of the honest belief rule are clear. A plaintiff is required to show 'more than a dispute over the facts upon which the discharge was based.'" *Seeger*, 681 F.3d at 285 (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001)). Instead, an employee "must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite*, 258 F.3d at 493–94.

> "Under [this] rule, an employer's proffered reason is considered honestly held where the employer can establish it reasonably reli[ed] on particularized facts that were before it at the time the decision was made. Thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held. An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact.

*Seeger*, 681 F.3d at 285 (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)). "When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Chen*, 580 F.3d at 401 (internal quotation marks and citation omitted). However, "the burden is on the employer 'to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" *Clay*, 501 F.3d at 714 (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006)).

"We have not required that the employer's decision-making process under scrutiny 'be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Seeger*, 681 F.3d at 285 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

34

Further, "'the falsity of [a] [d]efendant's reason for terminating [a] plaintiff cannot establish pretext as a matter of law' under the honest belief rule." *Id.* (quoting *Joostberns*, 166 F. App'x at 794). "As long as the employer held an honest belief in its proffered reason, 'the employee cannot establish pretext even if the employer's reason is ultimately found to be mistake, foolish, trivial, or baseless.'" *Id.* at 285–86 (quoting *Smith*, 155 F.3d at 806.) "An employer's invocation of the honest belief rule does not automatically shield it, because the employee must be afforded the opportunity to produce evidence to the contrary, such as an error on the part of the employer that is 'too obvious to be unintentional.'" *Id.* at 286 (quoting *Smith*, 155 F.3d at 807).

There remains a genuine dispute of material fact as to whether the relevant decision makers held an "honest belief" that Day had violated company policy by increasing temporary employees' wages and reasonably relied on the facts presented to them by the 2012 investigation. At her deposition, Schultz testified that

> Q:   Have you ever seen anything in writing where it has said that the plant manager is the one that has to approve temporary raises as opposed to Tom Weaks or Mr. Koelsch[8], could request and make sure a temporary received a raise?
>
> A:   Not that I recall seeing anything.
>
> Q:   If it's a rule, it's an unwritten rule?
>
> A:   If it's a rule.
>
> Q:   Do you know anywhere where that rule is in writing that only the plant manager can approve adjustment to temporary employees' pay?
>
> A:   At this time, I can't recall seeing anything like that.
>
> Q:   I don't mean to be flippant, but we've been crossing swords for two years, and that's been one of the central issues. You think if that rule was written down anywhere, we would have found it by now?

---

[8] These two individuals were production managers in the Jackson facility.

35

A:      I don't know.

Q:      Would you do this, would you look for it one more time?

A:      I would.

Q:      If you find there is a written rule that existed, that was written down somewhere before Mr. Day was fired, could you get that to Ms. Sponseller?

A:      I will.

Q:      You would agree with me that terminating an employee is the most severe sanction that a company can do, perhaps other than criminal prosecution?

A:      Yes.

Q:      And that it's fair to give an employee warning if they're violating a rule?

A:      Yes.

Q:      And that if the violation of the rule is severe enough to result in termination, there ought to be fair notice?

A:      Yes.

(Schultz Dep. at 19–21, D.E. 75-11.)   Schultz recalled that temporary employees were given raises after Day's termination, and that the process was memorialized with a written list approved by Battle.   (*Id.* at 26–27.)   At his deposition, Kurtz testified that Battle asked him to investigate why the SPO budget had been exceeded.   (Kurtz Dep. at 79, D.E. 78-15.)   In doing so, Kurtz interviewed several individuals and asked specific questions.   (*Id.*)   Kurtz was asked

Q:      How did Jerry [Day] document that he had been given approval for the change in the rate of pay?

. . . .

A:      I don't remember ever seeing anything that he was given approval to do that.   In fact, what my investigation revealed was that he

36

didn't have authority to do that, to give rates of pay increases to
temporaries.

(*Id.* at 83–84.)  Kurtz stated that he did not investigate whether Day's predecessors had approved

temporary employees' pay increases.  (*Id.* at 85–86.)  He also said that he asked Battle whether

he authorized any of the pay increases that Day was accused of approving, and Battle said he had

not.  (*Id.* at 87–88.)  Kurtz and Schultz met with Day on June 27, 2012 and asked about the pay

increases, to which Day stated he was told by Kaveney that he was responsible for all the HR

functions in Jackson, which included the authority to give pay raises to temporary employees.

(*Id.* at 99–100.)  On July 2, 2012, Kurtz contacted Kaveney, who told him she never told Day he

had authority to increase the temporaries' pay rates without the operation manager's approval,

but instead had instructed him to work with the Jackson management staff when adjusting

salaries.  (*Id.*)

There is evidence in the record that there was no written policy for approving temporary

employees pay rates.  There is a dispute as to whether this unwritten policy existed, or was

enforced consistently before Day was hired, as Kurtz's investigation only focused on pay raises

given while Day was the FAC.  (Kurtz Dep. at 86–87, D.E. 78-15.)  Considering all of this

evidence, a jury could conclude that the relevant decision makers did not have an honest belief in

the facts supporting their decision to terminate Day's employment.  *See Wright v. Univ. of
Cincinnati*, ___ F. Supp. 3d ____, No. 1:13-CV-529, 2014 WL 4912877, at *6–7 (S.D. Ohio

Sept. 30, 2014).    Therefore, Defendant's motion for summary judgment on this claim is

DENIED.[9]

_____

[9] Plaintiff has offered evidence he believes demonstrates that the discriminatory atmosphere at the
company's Jackson facility and supports his pretext arguments.  However, only two of his race discrimination
claims reach the pretext stage of the *McDonnel Douglas* burden-shifting framework.  The Court has found that
genuine issues of material fact remain as to the reasons justifying Plaintiff's termination.  However, the Court
concluded that Day was unable to demonstrate pretext in the Defendant's reasons for issuing him two written

## II.     <u>Hostile Work Environment</u>

Day alleges that following his complaints of race discrimination and retaliation he was subjected to a hostile work environment under Title VII and the THRA.  (Compl. ¶¶ 20–28, 38; D.E. 75 at 21–23.)  Courts analyzing hostile work environment claims under both statutes use the same standards.  *See Jones v. City of Franklin*, 468 F. App'x 557, 565 (6th Cir. 2012). To succeed on a hostile work environment claim, "a plaintiff must demonstrate that (1) [he] belonged to a protected group, (2) [he] was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act."  *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078–79 (6th Cir. 1999)).

Title VII "does not set forth a 'general civility code,' and it does not protect employees from the 'ordinary tribulations' accompanying run-of-the-mi[ll], if sometimes petty, social interactions."  *Henry v. Fed. Reserve Bank of Atlanta*, ___ F. App'x ____, No. 14-5618, 2015 WL 1652415, at *2 (6th Cir. Apr. 14, 2015) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  Instead, Title VII "targets conduct that 'unreasonably interfere[s] with [an employee's] work performance by creating an intimidating, hostile, or offensive work environment.'"  *Id.* (quoting *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)).

Day provides several incidents in support of his hostile work environment claim, which include: (1) receiving two written warnings; (2) harassing remarks; (3) receiving blame for actions he did not cause; (4) diminishing responsibilities over time; (5) failing to give him the

---

warnings because he could not identify a similarly situated employee.  Therefore, the Court need not address the relevancy of Plaintiff's discriminatory atmosphere evidence at this time.

title of HR Manager and its corresponding salary; and (6) failing to place him on the "high potential" list.  (D.E. 75 at 22.)  FB disputes whether these incidents satisfy the third and fourth elements of a hostile work environment claim.  (D.E. 71-1 at 17–24.)

A.    *Harassment Based on Race*

While Plaintiff lists a litany of examples he contends were sufficiently severe and pervasive to alter the conditions of his employment, he has failed to demonstrate how several of them were based on his race.   A plaintiff can prove harassment was based on race "by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Williams*, 643 F.3d at 511 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998)).  "Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist to qualify."  *Id.* (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007)).

1.    **Written Warnings**

Day avers that the two written warnings he received contributed to the severe and pervasive work environment at FB, (D.E. 75 at 22), but does not explain how they can be characterized as harassment based on his race.  *See Russell v. Univ. of Toledo*, 537 F.3d 596, 608 (6th Cir. 2008) ("Again, however, the plaintiff has adduced absolutely no evidence to indicate that any of the allegedly hostile or harassing actions were in any way race-based.").   It is undisputed that two Caucasian employees also received written warnings for conduct arising from one of these events.  (Schultz Dep. at 48–49, D.E. 75-9.)

Plaintiff received a second written reprimand from Schultz because she concluded that he had accessed Battle's work files through the company server.  (*Id.* at 86, D.E. 75-11.)  After

receiving this second warning, Day accused Ross of remoting into his work computer and accessing Battle's files in an attempt to sabotage his employment. (Day Dep. at 350–51, D.E. 76-8; *Id.* 486–89, D.E. 76-9.)  He contends that after he made this allegation, FB refused to conduct an investigation.  Day produced several computer screenshots that appear to show the logins "Anonymous" and "MROSS" accessing what appears to be Day's work computer.  (D.E. 77-20.) Plaintiff cannot offer any direct or circumstantial evidence that the second warning was based on race.  He has not shown that either warning "would not have occurred but for [his] race." *Williams*, 643 F.3d at 511.  Therefore, this incident cannot support a hostile work environment claim.

### 2.      *Unfair Blame for Actions Not Caused by Plaintiff*

Plaintiff offers no factual content for this example, but instead, directs the Court to comb through the eighteen-page "Discrimination" section of his brief for citations that support this allegation.  (*See* D.E. 75 at 22.)  After reviewing that section of Day's brief, the Court is unable to determine what unfair blame he allegedly received.  As such, the Court cannot make the determination that this unfair blame was based on Day's race.  *See Miller v. Gen. Motors, LLC*, No. 12-14633, 2015 WL 128012, at *23–24 (E.D. Mich. Jan. 8, 2015) (granting summary judgment in favor of the defendant on the plaintiff's hostile work environment claim because it only included "general allegations" and failed to provide evidence that the plaintiff was harassed on the basis of his race).  Therefore, this incident cannot support a hostile work environment claim.

### 3.      *Diminished Responsibilities*

Day again fails to provide the Court with any specific facts for this example and how it is evidence of a hostile work environment.  Reviewing the "Discrimination" section of his brief

fails to shed any light on what responsibilities were taken from him.  *See id.*  Therefore, this incident cannot support a hostile work environment claim.

      B.     *Severe or Pervasive*

"Title VII protects employees from a workplace [ ] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ."  *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 878 (6th Cir. 2013) (internal quotation marks and citation omitted).  This conduct must be "'severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive.'"  *Id.* (quoting *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000)).  In considering whether a work environment is hostile, courts look to "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance.'"  *Id.* (quoting *Bowman*, 220 F.3d at 463.)  "A 'work environment viewed as a whole may satisfy the legal definition of an abusive work environment . . . even though no single episode crosses the Title VII threshold.'"  *Id.* (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999)).

      *1.*     ***Harassing Remarks***

Day alleges that he was subjected to "harassing remarks."  (D.E. 75 at 22.)  He does not identify who made the remarks, what the remarks were, or when they occurred, except again directing the Court to search the "Discrimination" section of his brief.  (*Id.*)  The Court assumes that Plaintiff is referencing statements allegedly made by Bob Battle.  Sometime in 2010 or 2011, Battle called a female employee, a "Mexican".  (*Id.* at 20–21.)  Day recalls that sometime

in 2010 or 2011, Battle asked him whether he would be attending a jazz or blues festival, to which Day remarked that he did volunteer at such a festival. (*Id.*) He remembers Battle telling him that they needed to "hire a handicapped minority" for a vacant production supervisor position. (*Id.*) Day recalls that Battle called him a "halfbreed" after hearing that some of Plaintiff's ancestors were both white and black, and also said he did not like being in the same bar as African Americans or homosexuals. (*Id.*)

### 2. *Failure to give HR Manager title, corresponding pay and to place on "High Potential" list*

As discussed, Day believes that while he was hired to perform Hall's duties, FB's refusal to give him Hall's title and salary created a hostile work environment. (D.E. 75 at 22.) He also insists that FB's refusal to place him on the "high potential" list, while similarly situated Caucasian employees were, further supports his hostile work environment claim. (*Id.*)

### 3. *Conclusion*

Considering all of these incidents together, the Court finds that they do not rise to the kind of harassment that was sufficiently severe or pervasive to support a hostile work environment claim as a matter of law. None of these allegations demonstrates that Day's workplace was permeated with discriminatory intimidation, ridicule, or insult. These incidents were not widespread. Battle's stray remarks, while possibly offensive, occurred over a period of two years. These incidents were not severe. Battle's comments, FB's failure to give Day Hall's job title or salary, and its refusal to place him on the "high potential" list did not alter the conditions of Day's employment and create an abusive working environment. *Warf*, 713 F.3d at 878. Therefore, Defendant's motion for summary judgment on this claim is GRANTED.

## III.   Retaliation

Day alleges he was terminated because of the numerous complaints he made about racial disparity at the Jackson facility.  (D.E. 75 at 24–31.)  "Title VII prohibits discriminating against an employee because that employee has engaged in conduct protected by Title VII."  *Laster*, 746 F.3d at 729.  So does the THRA.  *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 758 (6th Cir. 2012).  To establish a prima facie retaliation claim using circumstantial evidence, as in this case, a plaintiff is required to show that "(1) he engaged in protected activity, (2) the [defendant] knew that [the plaintiff] had exercised his civil rights, (3) the [defendant] took an adverse employment action against [the plaintiff], and (4) there was a causal connection between [the plaintiff's] protected activity and the adverse employment action."  *Kuhn*, 709 F.3d at 627–28 (citing *Morris*, 201 F.3d at 792).  The burden of establishing a prima facie case of retaliation is "minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity."  *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

If Day makes out a prima facie case, the burden shifts to FB to "produce a legitimate, non-retaliatory reason for its action."  *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014).  If FB produces such a reason, "the burden shifts back to [Day] to put forward competent evidence from which a reasonable jury could conclude that the stated reason is merely pretextual."  *Id.*  "Ultimately, [Day] will have to 'establish that . . . [his] protected activity was a but-for cause of the alleged adverse action by the employer.'"  *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ____, 133 S. Ct. 2517, 2534 (2013)).

A.     *Which retaliation claims are properly before the Court*

The Court must first determine whether Day has pled multiple retaliation claims. Plaintiff alleges in his response brief that after submitting each of his five internal complaints, the company retaliated against him. (D.E. 75 at 23–29.)  Title VII makes it "unlawful . . . for an employer to discriminate against any . . . employee[ ] . . . because he has opposed any practice made . . . unlawful . . . under this subchapter."  42 U.S.C. § 2000e-3(a).  The term "oppose" is left undefined in the statute, but the Supreme Court has held that it carries its ordinary meaning, "to resist or antagonize . . . ; to contend against; to confront; resist; withstand."  *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (citing Webster's New International Dictionary 1710 (2d ed. 1958)).  This means Title VII protects not only formal complaints filed with the EEOC, but also complaints to management.  *Laster*, 746 F.3d at 730. Day submitted internal complaints on July 13, 2011, July 18, 2011, November 11, 2011, April 24, 2012, June 28, 2012 and an EEOC charge on July 6, 2012.  FB's summary judgment motion only focuses on retaliation arising from Day's June 28, 2012 complaint and his July 6, 2012 EEOC charge.  (*See* D.E. 71-1 at 25–26; D.E. 89 at 20–21.)

In his complaint, Day brings "claims involv[ing] an ongoing series of discrimination and retaliation based on race."  (Compl. ¶ 1, D.E. 1.)   He alleges that he "experienced discrimination and retaliation in job duties, salary, and privileges, discriminatory comments directed to him, failure to promote in his employment, and finally termination of his employment all based upon his race and upon reporting to the EEOC."  (*Id.*)  He "has also sued Defendant for retaliation for Plaintiff's opposition to gender and race discrimination pursuant to 42 U.S.C. § 2000(e)-(3)(a) (2010)."  (*Id.* ¶ 7.)  Under the "Facts" section of his complaint, Plaintiff claims that he "filed a written complaint to the division Human Resource manager on July 18, 2011.  In retaliation for his complaint, the Operation Manager routinely denied Plaintiff's request for things that were

necessary for his job." (*Id.* ¶ 25.)  He also contends that "[o]n approximately August 1, 2012, the Defendant received a copy of Plaintiff's EEOC charge, and Plaintiff was terminated on August 13, 2012 in retaliation for his reporting to the EEOC and for filing an EEOC Charge." (*Id.* ¶ 35.) Under the "Causes of Action" section of his complaint, Day lists the following: "Under Title VII of the Civil Rights Act of 1963 (sp) for discriminatory and retaliatory treatment based on race and for retaliation for filing an EEOC Complaint." (*Id.* ¶ 38a.)

The Court finds that Day has pled two retaliation claims: one related to the July 6, 2012 EEOC charge, and the other to the July 18, 2011 internal complaint. *See Cole v. Shadoan*, 782 F. Supp. 2d 428, 437 (E.D. Ky. 2011) ("Although there is no allegation in Plaintiff's Complaint about bullying or retaliation after May 9, 2009, Plaintiff argues these new claims in response to summary judgment. . . . The deadline for the parties to move to amend pleadings [has passed]. It is too late now for Plaintiff to be adding new allegations."); *see also* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.  At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a).").  The Sixth Circuit has stated that the Federal Rules of Civil Procedure "require that we not rely solely on labels in a complaint, but that we probe deeper and examine the substance of the complaint." *Minger v. Green*, 239 F.3d 793, 799 (6th Cir. 2001).  However, "[o]nce a case has progressed to the summary judgment stage . . . 'the liberal pleading standards . . . are inapplicable.'" *Tucker v. Union of Needletrades, Indus. and Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

Defendant did not address Plaintiff's claim of retaliation arising from his July 18, 2011 internal complaint; therefore, its motion for summary judgment on that issue is DENIED.  *See Celotex Corp.*, 477 U.S. at 323 ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion . . . .").

B.      Termination

For the purposes of its motion, FB concedes that Day can satisfy the first three elements of the prima facie case, but argues he has failed to establish a causal connection between his protected activities and termination, and cannot show that FB's legitimate, non-retaliatory reason for terminating him was pretextual.  (D.E. 71-1 at 24–28; D.E. 89 at 19–23.)

1.      Causal Connection

Day sent Schultz an internal complaint on June 28, 2012, and submitted an EEOC charge on July 6, 2012.  His employment was terminated on August 13, 2012.  FB insists that because he was on his final written warning, and being investigated for raising temporary employees' pay rates, an inference of causation cannot be based solely on the temporal proximity between his termination and the filing of those complaints.  (D.E. 71-1 at 25.)

"Causation is shown where the evidence is 'sufficient to raise the inference that protected activity was the likely reason for the adverse action.'"  *Kurtz v. McHugh*, 423 F. App'x 572, 578 (6th Cir. 2011) (quoting *Michael*, 496 F.3d at 596).  Typically, the causal connection element is satisfied "'only where the adverse employment action occurred within a matter of months, or less, of the protected activity.'"  *Gambill v. Duke Energy Corp.*, 456 F. App'x 578, 589 (6th Cir. 2012) (quoting *Dixon*, 481 F.3d at 334).

However, in *University of Texas Sw. Med. Ctr. v. Nassar*, ___ U.S. _____, 133 S. Ct. 2517 (2013), the United States Supreme Court noted that "an employee who knows that he or

46

she is about to be fired for poor performance, . . . . [t]o forestall that lawful action, . . . might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation." *Id.* at 2532. This statement expands on the Court's holding in *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001), that "[e]mployers . . . proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Id.* at 272. The Sixth Circuit has stated that "employees who are about to be fired should not abuse the civil-rights protections by filing frivolous harassment complaints. However, it cannot be open season for supervisors to . . . harass poorly performing employees. Such employees must still be provided with their legal protections." *Montell*, 757 F.3d at 507.

The Sixth Circuit proposed balancing these competing interests by refusing to infer causation based solely on temporal proximity when there is evidence that the employer was investigating the employee prior to the protected activity. *Id.* This requires courts to

> analyze the evidence of how and when the adverse employment action occurred to determine whether it squares with the action previously contemplated. If it does, then temporal proximity is not evidence of causality, but if the adverse employment action is unlike the action previously contemplated or does not occur on the schedule previously laid out, then the temporal proximity of the adverse action to the protected conduct is certainly evidence of causation.

*Id.* Courts considering retaliation claims with these issues must determine "'what made [the employer] fire [the employee] when it did.'" *Id.* (quoting *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009)).

In *Montell*, there was evidence that the defendant had "taken significant time to develop a written record of [plaintiff's] poor performance," including the development of a performance improvement plan, documented oral counseling and two written warnings. *Id.* There was also evidence that multiple supervisors had been consulted before each step was taken. *Id.* at 507–08.

The final warning issued by the defendant stated that the plaintiff had thirty days to meet the requirements set forth in the performance improvement plan, and that failure to do so could result in termination.  *Id.* at 508.  The plaintiff filed a sexual harassment complaint during the thirty-day probationary period, and the next day was called into her supervisor's office and told to resign or be fired.  *Id.*  There was testimony that the supervisor who gave the ultimatum failed to consult with any other supervisors, or follow any of the previous steps.  *Id.*  The court found that

> [t]hese actions . . . simply do not accord with either the timing of the termination previously contemplated or with the manner in which that decision was being made.  Instead, the actions appear to be evidence of retaliation by [defendant] against [plaintiff] for filing a sexual harassment complaint against him.  Thus, despite the previous contemplation of [plaintiff's] discharge, the nature of the actions taken and their timing suggest that the proximity of [plaintiff's] discharge to her protected activity can be used as evidence of a causal connection.  Because of the temporal proximity and other evidence of a causal connection, we conclude that [plaintiff] has successfully presented a prima facie case of retaliation.

*Id.*

Battle testified that he began investigating the SPO budget overrun sometime in early May 2012 after receiving the April 2012 budget numbers.  (Battle Dep. at 231, D.E. 76.)  On May 10, 2012, Battle sent an email to Day, Kurtz and Schultz inquiring about the disparity in pay among the temporary employees.  (D.E. 76-2 at 9.)  Kurtz testified that Battle then asked him to investigate the budget overrun to determine its cause.  (Kurtz Dep. at 115, D.E. 78-15.)  Following an investigation during the summer of 2012, Kurtz concluded that Day authorized pay rate increases without approval in violation of company policy.  (*Id.* at 116.)  Kurtz, Schultz and Battle recommended that Day's employment be terminated.  White agreed, and Day was fired on August 13, 2012.

FB relies on *Reynolds v. Federal Express Corp.*, 544 F. App'x 611 (6th Cir. 2013) and *Sosby v. Miller Brewing Co.*, 415 F. Supp. 2d 809 (S.D. Ohio 2005) to support its contention that

an employer's ongoing investigation negates the significance of temporal proximity in establishing causation.   (D.E. 71-1 at 26 and D.E. 89 at 20–21.)   FB contends that its investigation into Day's unilateral adjustment of temporary employees' pay rates began well before he submitted his June 28, 2012 complaint or his July 6, 2012 EEOC charge, and is sufficient to break the chain of causation linking Day's termination (the adverse action) to the protected conduct (the two complaints).   However, in *Reynolds*, the plaintiff's only complaint about racial discrimination occurred well after the employer had already contemplated terminating his employment.  544 F. App'x at 615.  Likewise, in *Sosby*, the district court found the plaintiff had not established a causal connection because the defendant's decision to terminate her occurred five months after she filed her first charge, and before it had knowledge of her second charge.  415 F. Supp. 2d at 815, 822.  Plaintiff frames FB's actions during this period as a chain of retaliatory conduct culminating in his August 13, 2012 termination.  He asks the Court to infer causation based on the temporal proximity of his complaints and termination. (D.E. 75 at 27–29.)

Standing alone, Day's April 24, 2012 complaint and his August 13, 2012 termination are too far apart to establish a causal connection based solely on temporal proximity.  He must put forth additional evidence to satisfy his prima facie burden.   He alleges that the entire investigation into the budget overrun was a retaliatory action by Battle for his April 24, 2012 complaint.   (*Id.* at 28.)   However, it is undisputed that the company's labor budget was dramatically over projections in April 2012.  Battle, as upper management, was justified in looking at the numbers and ordering Kurtz to investigate further.  Plaintiff has not put forth any other evidence demonstrating a causal connection between his protected activities and his termination.  The Court cannot consider the June 28, 2012 complaint or the July 6, 2012 EEOC

charge because those protected activities occurred after FB had begun its investigation and was "proceeding along lines previously contemplated." *Breeden*, 532 U.S. at 272. Therefore, Defendant's motion for summary judgment on this claim is GRANTED.

## IV.    Retaliatory Discharge under Tennessee Common Law and the TPPA

Day insists he was terminated in violation of Tennessee common law and the TPPA because of his whistleblowing and refusal to participate in unlawful activities. (Compl. ¶¶ 9 and 38(c)–(d), D.E. 1; D.E. 75 at 31–32.)   "In Tennessee, the employee-employer relationship is ordinarily governed by the employment-at-will doctrine, 'a long standing rule . . . which recognizes the concomitant right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty of a legal wrong.'" *Haynes v. Formac Stables, Inc.*, ___ S.W.3d ____, 2015 WL 1408917, at *2 (Tenn. Mar. 27, 2015) (quoting *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997)).   An exception to this doctrine in Tennessee is an action for retaliatory discharge. *Id.* (citing *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 445 (Tenn. 1984)). In Tennessee, a plaintiff alleging common law retaliatory discharge must show:

(1)    that an employment-at-will relationship existed;

(2)    that the employee was discharged[;]

(3)    that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and

(4)    that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Id.* (quoting *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002)).   As the Tennessee Supreme Court explained in *Haynes*, "[o]ne of the factual scenarios that will support a

common law cause of action for retaliatory discharge is when an employee is discharged for refusing to remain silent about his employer's illegal activity or unsafe practices—commonly referred to as a 'whistleblower' claim." *Id.* (citing *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 787 (Tenn. 2010)).

Employees can also bring a similar claim under the TPPA, which provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). "The primary difference in the statutory version of the cause of action is that it requires an employee to show that his or her refusal to remain silent was the *sole* reason for the discharge, whereas a common law claimant must show only that his or her refusal to remain silent was a substantial factor motivating the discharge." *Haynes*, 2015 WL 1408917, at *2 (citing *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. 2002)). "A factor is 'substantial' if it was 'an important or significant motivating factor for the discharge.'" *Walls v. Tenn. CVS Pharmacy, LLC*, 21 F. Supp. 3d 889, 897 (M.D. Tenn. 2014) (quoting *Coleman v. Humane Soc'y of Memphis*, No. W2012-02687-COA-R9-CV, 2014 WL 587010, at *26 (Tenn. Ct. App. Feb. 14, 2014)).

Tennessee courts follow the *McDonnell Douglas* burden-shifting framework in analyzing retaliatory discharge claims brought under either the TPPA or Tennessee common law. *See Levan v. Sears, Roebuck & Co.*, 984 F. Supp. 2d 855, 870 (E.D. Tenn. 2013). Plaintiffs have "the initial burden of setting forth a prima facie case of retaliatory discharge, after which the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its action." *Id.* (citing *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 200 (Tenn. Ct. App. 1999)). The burden then shifts backs to the plaintiff to demonstrate that the proffered reason was pretextual. *Id.*

FB asserts that Day cannot establish that the submission of his internal complaints and EEOC charge were the sole or substantial reasons leading to his termination.  (D.E. 71-1 at 29.) It cites *Caruso v. St. Jude Research Hospital, Inc.*, 215 F. Supp. 2d 930, 937 (W.D. Tenn. 2002) for the proposition that temporal proximity alone is insufficient to infer causation under either the TPPA or Tennessee common law.  (*Id.*)  Plaintiff asks the Court to infer causation based on the temporal proximity of his complaints and the retaliatory actions taken against him.  (D.E. 75 at 32.)

A.      Causation

"'Evidence of causation requires more than the facts showing employment, the exercise of rights, and a subsequent discharge.  It requires direct evidence or compelling circumstantial evidence.  The plaintiff's mere belief or understanding of why he was dismissed, is not sufficient to create a genuine issue of material fact.'"  *Smith v. C.R. Bard, Inc.*, 730 F. Supp. 2d 783, 800 (M.D. Tenn. 2010) (quoting *Provonsha v. Students Taking a Right Stand, Inc.*, No. E2007-469-COA-R3-CV, 2007 WL 4232918, at *5–6 (Tenn. Ct. App. Dec. 3, 2007)).

Plaintiff testified that Battle's refusal to hire African Americans was one illegal activity in which he refused to participate in or about which to remain silent.  (Day Dep. at 703–09, D.E. 76-10.)  He related that his unwillingness to keep Battle's alleged inappropriate relationship with another co-worker "under wraps" also was such an illegal activity.  (*Id.* at 707–08.)  The incident involving the failure to hire African Americans occurred in early 2012, while the harassment occurred sometime in early 2011.  (*See id.* at 200, D.E. 76-7 and 510–11, D.E. 76-9.)  Day has not offered any proof suggesting that his refusal to remain silent about Battle's alleged violations of federal and state discrimination laws was even considered by White when he made the decision to terminate his employment in August of 2012, "let alone that it served as a motivating

factor to the extent required under the TPPA and common law." *Hugo v. Millennium Labs., Inc.*, 590 F. App'x 541, 544–45 (6th Cir. 2014).

Plaintiff argues that the investigation into the SPO overrun was "nothing more than Battle's attempt to find a way to terminate Day after his four complaints of racism," (D.E. 75 at 27), but this conclusory statement is not evidence that White, the supervisor who made the decision to end his employment, considered his refusal to remain silent in any meaningful way, let alone as a substantial or sole factor affecting his decision.  The July 6, 2012 EEOC charge and the June 28 2012 internal complaint are not compelling circumstantial evidence of causation because temporal proximity alone is insufficient to establish the causation element for either claim.  *Walls*, 21 F. Supp. 3d at 898.

Day has not provided any evidence that would allow the Court "to conclude that [he] was fired because of any refusal to participate in [or remain silent about] illegal activities."  *Hugo*, 590 F. App'x at 545.  Therefore, the Defendant's motion for summary judgment on these claims is GRANTED.

## V.    **After-Acquired Evidence**

FB avers that Day is limited from recovering damages based on the after-acquired evidence doctrine because, during his employment, he copied, removed, and forwarded confidential documents in violation of the company's written policies and procedures.  (D.E. 71-1 at 30–34.)  White and Schultz submitted affidavits stating that had they known about Day's malfeasance at the time, they would have fired him immediately.  (Aff. of Betty Ann Schultz, ("Schultz Aff.") ¶¶ 11–13, D.E. 69-1; Aff. of Thomas White ("White Aff.") ¶¶ 3–5, D.E. 69-2.)

Plaintiff asserts that his work computer crashed constantly, necessitating that he email company documents to his personal email address to prevent their loss.  (D.E. 75 at 32.)  He was

also concerned that Ross was accessing his work computer in an attempt to sabotage him.  (*Id.*)
Plaintiff alleges that important documents concerning Hall's tenure as HR Manager for the
Jackson facility would have been lost had he not preserved them.  (*Id.*)  Day believes that his
actions did not violate the company's policy, which only required employees to keep information
away from third-parties, as he only shared information with Defendant and another co-worker
who had filed a discrimination suit.  (*Id.* at 33.)  Because questions of material fact remain as to
whether the company would have immediately terminated him had it learned of his actions, Day
argues summary judgment is inappropriate.  (*Id.* at 34.)

      The after-acquired evidence doctrine is an affirmative defense which bars "an employee
from obtaining certain remedies in a discrimination case" if "an employer can show that it would
have been entitled to terminate the employee for severe wrongdoing, if it had known of the
employee's wrongdoing at the time[.]"  *King v. William Beaumont Hosp.*, No. 10-13623, 2012
WL 5463761, at *2 (E.D. Mich. Nov. 8, 2012).  "As a general rule, under the after-acquired
evidence doctrine, the back pay award is limited and the employee is barred from obtaining front
pay and reinstatement." *Id.* (citation omitted); *Hawkins v. Ctr. For Spinal Surgery*, No. 3:12-cv-
01125, 2015 WL 1096970, at *3 (M.D. Tenn. Mar. 11, 2015) ("Generally, if a defendant
successfully proves an after-acquired evidence defense, the plaintiff's remedy is limited to back
pay starting from the date of the unlawful discharge to the date the defendant employer learned
of plaintiff's wrongdoing.").  "When an employer seeks to rely on after-acquired evidence of
wrongdoing, it must establish first, that the wrongdoing in fact occurred, and second, that the
wrongdoing was of such severity that the employee in fact would have been terminated." *Wyrick
v. Octapharma Plasma, Inc.*, No. 1:11-cv-652, 2011 WL 6888549, at *2 (W.D. Mich. Dec. 29,
2011) (citing *Wehr v. Ryan's Family Steak Houses Inc.*, 49 F.3d 1150, 1154 n.5 (6th Cir. 1995)).

Day has admitted to making physical copies and forwarding confidential company documents to his personal email addresses.  (Day Dep. at 777–808, D.E. 76-10.)  The employee handbook states that as a condition of employment, employees "agree not to disclose any confidential information or material to anyone outside ITW, either during or after your ITW employment."  (D.E. 75-12 at 86.)  Further, "[e]mployees who improperly use or disclose trade secrets or confidential information, whether intentionally or not, are subject to discipline, up to and including termination and legal action, even if they do not actually benefit from the disclosed information."  *Id.*  Examples of confidential information include "customer lists, financial data . . . wages and salaries, lists of employees and telephone and address lists."  *Id.*

Day signed a form acknowledging his receipt of this handbook.  (D.E. 68-2 at 6.)  He also signed a "Computer, E-Mail, Internet and Communication" form which stated "[e]mployees should not use a password, access a file or retrieve any stored communication without authorization."  (D.E. 68-2 at 8.)   Employees who violated this policy were subject to disciplinary action "up to and including termination."  (*Id.*)

In support of its motion, FB cites to cases outside the Sixth Circuit where courts have granted summary judgment in favor of employers on their after-acquired evidence defenses.  In *Nesselrotte v. Allegheny Energy, Inc.*, 615 F. Supp. 2d 397 (W.D. Pa. 2009), the plaintiff argued that summary judgment on the defendant's after-acquired evidence defense was inappropriate because there was still a genuine issue of material fact as to whether the defendant would have terminated her employment for copying and removing documents that were subject to the attorney-client privilege.  *Id.* at 400–07.  The defendant provided an affidavit from its general counsel, who stated that had he known of plaintiff's conduct, he would have recommended she be terminated immediately.  *Id.* at 406.  Defendant also provided examples of when it had

terminated other employees who had copied and removed confidential information.  *Id.*   The district court found that the plaintiff's subjective belief that she would not have been terminated for her conduct was insufficient to create a genuine issue of material fact.  *Id.* at 406–07.  The district court noted that the plaintiff had not "provided any evidence that an employee who engaged in similar conduct was not terminated by [the defendant]."  *Id.* at 406.

Day labels Schultz's and White's affidavits as self-serving.  In support, he cites to *Welch v. Liberty Mach. Works, Inc.*, 23 F.3d 1403 (8th Cir. 1994), *abrogated by McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352 (1995), where the Eighth Circuit held that an affidavit from the defendant's president that he would have terminated the plaintiff's employment was self-serving and insufficient, on its own, to support the defendant's request for summary judgment on its after-acquired evidence defense.  *Id.* at 1404–06.  In so holding, the *Welch* court was concerned that the president's statement that he would have terminated the plaintiff was based on a policy that was informal and unwritten.  *Id.* at 1405–06.  The court held that "the employer bears a substantial burden of establishing that the policy pre-dated the hiring and firing of the employee in question and that the policy constitutes more than a mere contract or employment application boilerplate."  *Id.* at 1406.  Day also cites *Maiden v. APA Transp. Corp.*, No. C-1-00-883, 2002 U.S. Dist. LEXIS 8076 (S.D. Ohio May 3, 2002), where the district court found that the employer was not entitled to summary judgment on its after-acquired evidence defense because it failed to provide evidence that the hiring policy had been enforced consistently in the past.  *Id.* at *15.  The district court noted that the employer's "bald statement" that it would not have hired the plaintiff created a credibility issue that should be resolved by a jury.  *Id.*

Here, FB has not provided any examples of employees that it has terminated for similar conduct, like the defendant in *Nesselrotte*.  Day argues that because other employees were not

terminated for blind carbon-copying emails, he would have avoided termination had FB discovered him copying and emailing confidential documents to his personal email account.  As the party seeking to rely on after-acquired evidence of wrongdoing, FB "must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."  *McKennon*, 513 U.S. at 362–63.  There remain disputed questions of fact as to whether Day's actions were sufficiently severe enough that he would have been terminated for doing so.    Therefore, Defendant's request for summary judgment on this claim is DENIED.

## VI.   <u>Punitive Damages</u>[10]

"Title VII allows recovery of punitive damages only if a complaining party 'demonstrates that the respondent engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'"  *Quinn v. Griffith*, 515 F. App'x 543, 551 (6th Cir. 2013) (quoting 42 U.S.C. § 1981a(b)(1)).  While Defendant argues that Plaintiff cannot recover punitive damages because there is no evidence of intentional discrimination, the Court having found that there still exist genuine questions of material fact as to Plaintiff's Title VII and state law claims, the issue of intent is best decided by a jury. Therefore, Defendant's motion for summary judgment on this issue is DENIED.

*Conclusion*

For the reasons set forth above, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Plaintiff's race discrimination arising out of his termination and his retaliation claim arising out of the submission of his July 2011 internal complaint will proceed to trial.  All of Plaintiff's remaining claims are hereby DISMISSED.

IT IS SO ORDERED this 14th day of May, 2015.

---

[10] Day has waived his punitive damages claim under the THRA.  (*See* D.E. 75 at 35 n.6.)

s/ J. DANIEL BREEN                
CHIEF UNITED STATES DISTRICT JUDGE